*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0323**

In re the Marriage of:
Daria Vladimirovna Tinaza, petitioner,
Appellant,

vs.

Justin Andrew Tinaza,
Respondent.

**Filed January 5, 2015
Affirmed in part, reversed in part, and remanded
Hooten, Judge**

Dakota County District Court
File No. 19AV-FA-09-2457

Kathleen M. Newman, Kathleen M. Newman & Associates, P.A., Minneapolis, Minnesota (for appellant)

Christopher M. Banas, Banas Family Law, P.A., Lilydale, Minnesota (for respondent)

Considered and decided by Rodenberg, Presiding Judge; Johnson, Judge; and Hooten, Judge.

## UNPUBLISHED OPINION

**HOOTEN**, Judge

In this parenting dispute, appellant-mother argues that the district court erred by: (1) denying her motion to relocate to California with her minor child; (2) awarding respondent-father sole physical custody if mother decides to relocate to California; and

(3) awarding father child support.  We affirm the district court's denial of mother's motion to relocate and its custody and child-support determinations in all respects except as to the retroactive date of mother's child-support obligation.  We reverse the district court's decision as to the retroactive date of mother's child-support obligation and remand for the district court to modify the retroactive date.

## FACTS

Appellant-mother Daria Vladimirovna Tinaza and respondent-father Justin Andrew Tinaza were married in 2002 and divorced in 2010 by stipulated judgment and decree.  They are parents of one minor child, M.T., who was seven years old at the time of the divorce and ten years old at the time of the relocation hearing.  The stipulated judgment and decree awarded the parties joint legal custody and awarded mother sole physical custody of M.T.  Father was granted parenting time of a minimum of one non-overnight visit per week, every other weekend from Friday evening until Sunday evening, two weeks of summer vacation, and alternating holidays.  Mother was awarded child support.

Mother is from Russia and father is from the United States.  The parties met and were married in Russia and M.T. was born there.  The family moved to the United States in 2003 and eventually moved to Minnesota.  Mother worked as a paralegal in the State of Washington before moving to Minnesota to attend law school.  At the time of the divorce, both parties lived in Eagan, Minnesota.  Father has worked as a software engineer since 2009 and has worked there full time since 2012.  His hours are "flexible."  Mother was a law student from 2008 to 2012.

2

On appeal, mother states that "[t]he parties had a troubled and difficult post-divorce relationship." Mother testified that her communications with father "were always very brief" and "only related to [M.T.'s] parenting schedule." Child support was modified three times in 2012 and 2013. The child-support-modification order from September 24, 2012, stated that "[mother] is voluntarily unemployed or underemployed." The district court added: "[Mother] has not provided verification of her income and has provided contradictory information in the form of cover letters to prospective employers and unsigned [f]ederal [t]ax returns with respect to her actual income. [Mother] has provided evasive and factually incorrect information to the court." Mother did not appeal this order.

Mother graduated from law school in May 2012. Mother's area of interest is intellectual-property law. Upon graduating, she tried to secure legal employment in Minnesota. She testified that she networked with prospective employers, applied to online job postings, spoke with her law school's career-services office, reached out to her mentor, spoke to recruiters, and solicited law firms and legal services companies. Mother was unable to find full-time work, but supported herself by working as an independent courtroom interpreter.

Mother became licensed to practice law in Minnesota in October 2012. Once she became licensed, she worked nearly full-time as a document-review attorney for a litigation-support company. This was an independent-contractor position. A debt-collection company in Mankato, Minnesota, expressed interest in hiring mother to manage its office at a yearly salary of $45,000 or $50,000. Mother testified that she did

3

not pursue this opportunity because it was not an attorney position, it did not have benefits, she did not know anyone in Mankato, and she did not want M.T. to change schools.

Mother testified that, while doing document review, she continued applying for attorney and non-attorney positions, and she considered other areas of law besides intellectual property. She also began to apply for positions that required Russian-language skills. However, on cross-examination, mother could not verify how many attorney positions she applied for after becoming licensed. She stated that she applied to "all [the] big [Twin Cities] law firms," but admitted that none of these applications were in her exhibits.

Around February 2013, mother applied for a document-review position that was located in California, required a law license and Russian fluency, and involved intellectual-property law. It was originally slated to last four to six weeks. She was offered the position and accepted because it paid $60 per hour and "it was a perfect fit." In late February or early March, mother told father that she was traveling out of town for a few weeks, but they could keep the usual parenting schedule. She did not tell him about the job. Nor did she tell him she would be in California. While mother was in California, M.T. initially stayed with mother's then-boyfriend at her Eagan townhome. Father did not ask mother with whom M.T. was staying, but assumed it was with mother's "Russian friends." Father testified that he did not ask who was watching M.T. because he knew mother would not give him accurate information, and he did not object to her traveling because of the parties' strained relationship. Mother did not want M.T. to

4

stay with father because she thought it would be best for father to simply have his usual parenting time. Father exercised his usual parenting time during March.

Mother's job in California was extended several times. She continued to live in California but maintained her Eagan townhome. Father testified that he realized mother was in California sometime in March, but it was not until early May that he learned from M.T. that mother was *working* in California. On May 21, mother thought her California position would end at the end of July, but she did not inform father of this. M.T. visited mother after the school year ended and stayed with her off and on throughout the summer. Mother initially stayed with friends in California, but eventually rented her own two-bedroom apartment in Mountain View, California. She explored school options for M.T. in Mountain View, including a Russian mathematics enrichment program. She felt this Russian program would allow him to connect with his Russian heritage. During his summer visits with mother, M.T. met some children his age in the area.

Mother testified that, while working in California, she continued to apply for jobs in both Minnesota and California. Yet, on cross-examination, she acknowledged that there were not many job applications in her exhibits, explaining that this was because she applied for several positions online. She was eventually offered a position as an in-house attorney with a California software company, which she accepted.

In late June, father went to California for his brother's wedding, and M.T. spent the week with him. Father then returned M.T. back to mother's custody in California. At the end of June, mother told father she would bring M.T. to Minnesota around July 4. However, by July 9, M.T. was not in Minnesota. Father then insisted that his regular

visitation schedule resume, and mother told him her job had been extended to the end of August. In late July, M.T. was staying with mother in California. Mother admitted at the evidentiary hearing that, when father asked for her address, she lied to him. Father suspected that mother was intending to relocate to California with M.T. and demanded that mother return M.T. to Minnesota, which she did shortly thereafter.

On August 2, 2013, father moved for an order: (1) finding mother in violation of the relocation statute, Minn. Stat. § 518.175, subd. 3 (2014); (2) finding mother in contempt of court for violating several provisions of the stipulated judgment and decree; (3) granting father temporary physical custody of M.T.; (4) granting mother parenting time in Minnesota; (5) suspending father's child-support obligation; and other relief. The parties appeared in district court on August 2. They reached an agreement, which was approved by the district court, in which M.T.'s temporary primary residence was to be with father, mother had parenting time in both Minnesota and California, and father's child-support obligation was suspended effective August 1. Subsequently, mother remained in California but visited M.T. every two to three weeks in Minnesota. Father assumed primary caretaking responsibilities, which included taking M.T. to and from school and facilitating his extracurricular activities. Mother wanted M.T. to see a therapist, but father objected because M.T.'s school social worker did not recommend an outside therapist.

On August 29, 2013, mother moved for an order: (1) granting mother permission to relocate with M.T. to California; (2) modifying father's parenting time; and other relief. In her motion, mother proposed a modified parenting-time plan. In essence, the

plan called for reduced school-year parenting time for father but increased summer parenting time. Mother later testified that, if her relocation request was granted, father and M.T. could call each other and could communicate via Skype. Father testified that if mother's relocation request was granted, he would e-mail and call M.T., and communicate via Skype, but noted that M.T. does not always answer his phone. On August 30, father brought a motion for an order modifying child support as a result of a change in M.T.'s primary residence.

Without notifying father, mother hired Dr. Jane McNaught, a licensed psychologist, to evaluate M.T. in light of mother's relocation request. Dr. McNaught did not meet with father before preparing her report. Dr. McNaught met with mother and M.T. and evaluated M.T. on August 31. She administered several "structured interview devices" to M.T., observed mother and M.T. interacting, and extensively interviewed M.T. In her report, Dr. McNaught addressed each of the statutory relocation factors. Her conclusions included: mother has been M.T.'s primary caretaker throughout his life and is more involved with his education than father; "[M.T.] is at an age where he could relocate and still maintain the type of contact with his father that he has enjoyed his entire life"; "[p]rojective testing clearly indicates that [M.T.] sees his overall life being better if he continues to primarily reside with his mother"; "in projective testing, [M.T.] does not see his life turning out as well if he were to live with his father"; M.T. is mature enough to express an opinion about his preference as to the relocation; and "[M.T.] is a very mature 10 1/2 year old child." M.T. expressed to Dr. McNaught a "preference" about the

relocation, but he was adamant that she not reveal it to his parents. After Dr. McNaught prepared her report, she invited father to speak with her, but father declined.

An evidentiary hearing took place in November 2013. In addition to the parties' own testimony, the district court heard testimony from Dr. McNaught and other witnesses.

Mother testified that the primary reason she wanted to relocate was to have better employment opportunities in order to increase her and M.T.'s quality of life. She claimed that the schools in California were "the best." She testified that, if the district court denied her relocation request, she would return to her home in Minnesota and cease her California employment. She also testified that her document-review job was extended until February 2014. She testified that she is M.T.'s "primary parent" and that, until recently, she was his primary caregiver. She supports M.T. emotionally and academically, and she enrolls him in extracurricular activities. She has always helped M.T. with his homework and attended his parent-teacher conferences. She stated that, historically, father's involvement with M.T.'s education has been "[m]inimal." She alleged that father declined to contribute money into a college fund for M.T. and stated that he is "not a supportive parent" because he used to pay only $500 in child support. She described father as a "weekend dad" and stated that he was not a good father. According to mother, father "views [parenting time] as a chore," and he was reluctant to accept additional parenting time when she offered it. Finally, she alleged that father rarely called M.T. over the summer while M.T. was in California.

Father testified that he opposes relocation because of mother's history of lying and concealing information about M.T., and because he fears he could not maintain his relationship with M.T. if relocation is granted. He also testified that M.T. does not like to fly alone. He testified that mother has interfered with his relationship with M.T. by refusing to release M.T. to him at times. Finally, he testified that M.T. is "very mature."

On December 23, 2013, the district court issued a ruling on the parties' motions. The district court denied mother's motion to relocate the residence of M.T. to California. The district court made a custody determination based on two alternative scenarios: if mother decided to relocate outside Minnesota, then father would be awarded sole physical custody of M.T.; on the other hand, if mother returned to Minnesota, then the custody arrangement outlined in the stipulated judgment and decree would be reinstated. The district court imposed a monthly child-support obligation on mother, retroactive to August 1, 2013, including basic support of $1,126 and child-care support of $297. In addition, if mother returned to Minnesota, the district court ordered her to request a hearing to address child support within 30 days. Mother appealed the district court's order.

**DECISION**

**I.**

Our review of a district court's decision on a parent's motion to relocate out of state with a minor child "is limited to considering whether the [district] court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Goldman v. Greenwood*, 748 N.W.2d 279, 284 (Minn. 2008) (quotations omitted).

9

We will set aside a district court's findings of fact only if they are clearly erroneous, "giving deference to the district court's opportunity to evaluate witness credibility." *Id.* "Findings of fact are clearly erroneous where an appellate court is left with the definite and firm conviction that a mistake has been made." *Id.* (quotations omitted).

A parent who has sole physical custody of a child subject to a parenting-time order may not relocate the child to another state except upon a court order or with the consent of the noncustodial parent. Minn. Stat. § 518.175, subd. 3(a). In determining whether to permit a parent to move a child's residence to another state when the other parent opposes the move, the district court must base that decision on the best interests of the child by assessing eight statutory factors. *Id.*, subd. 3(b). These factors are: (1) the child's relationship with the parents and other significant persons; (2) the child's age, development, and needs, and the likely impact of the relocation of the child; (3) the feasibility of preserving the child's relationship with the non-relocating parent; (4) the child's preference; (5) whether there is a pattern by the relocating parent to promote or thwart the child's relationship with the other parent; (6) whether relocation will enhance the child and the relocating parent's quality of life; (7) each parent's reasons for opposing or supporting relocation; and (8) the safety and welfare of the child or relocating parent relating to domestic abuse. *Id.* The parent seeking to relocate a child from Minnesota bears the burden of proof unless that party has been a victim of domestic abuse by the other parent. *Id.*, subd. 3(c).

Here, the district court analyzed each statutory factor and recited evidentiary support for its findings, as required by statute. *Id.* The relocation statute does not require

10

the district court to expressly find whether each factor supports or does not support the relocation, and the district court did not do so in this case, although doing so would have been helpful for our review.

*(1) Child's relationship with parents and other significant persons*

The district court found that mother has been M.T.'s primary caretaker since birth, the two have a "close and loving relationship," mother has attended all of M.T.'s school functions and conferences, and she has been primarily responsible for helping M.T. with homework. The district court also found that father has had a significant relationship with M.T. during his parenting time and has been active with M.T.'s extracurricular activities, and since August 2013 father has become M.T.'s primary caretaker. The district court noted conflicting testimony about father's willingness to accept additional parenting time.

*(2) Age, developmental stage, and needs of the child, and the likely impact the relocation would have on the child*

The district court found that M.T. was a "healthy, normal" ten-year-old boy. Dr. McNaught testified that M.T. "could essentially emotionally cope with the relocation." The district court concluded, "Whether [M.T.] could tolerate the move is not the standard and this [c]ourt finds that he would be emotionally distressed to be apart from either of his parents should this relocation request be granted." While M.T.'s ability to tolerate the move is not determinative, it is relevant under this factor. Mother argues that the district court abused its discretion by not giving more weight to Dr. McNaught's report and testimony. But, "[t]he weight to be given any testimony, including expert testimony, is

11

ultimately the province of the fact-finder." *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 167 (Minn. App. 2005).

*(3) Feasibility of preserving the child's relationship with the non-relocating parent*

The district court found that mother did not testify regarding a specific proposed parenting-time schedule for father, although mother did propose a specific schedule in her August 29 motion. Mother proposed parenting time for father of one long weekend per month, eight weeks of summer vacation, and alternate spring breaks and holidays. Mother suggested that M.T. and father could keep in touch during the school year through texting, phone calls, and Skype, but the district court found that M.T. neglects to answer his cell phone. Father stated that it would be financially difficult for him to visit M.T. in California, and there is conflicting evidence about M.T.'s ability to fly alone.

The district court credited father's concern that M.T. would learn to disrespect father if the relocation request was granted because mother disrespects father, that mother "manipulates" M.T., and that father's "relationship with [M.T. would] be seriously destroyed" if the relocation was granted. Mother admitted that she holds father in low esteem, but argued that she is committed to facilitating father's relationship with M.T. Mother also stated that she does not impose her negative feelings toward father onto M.T. The district court apparently found father's testimony regarding his concerns about the relocation to be credible, and "credibility determinations . . . are the province of the district court." *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 96 (Minn. App. 2008).

*(4) Child's preference*

"[G]iven his young age," the district court did not "give any weight to [M.T.'s] preference" as to relocation. Mother argues that the district court erred by not taking M.T.'s preference into account. In *Maxfield v. Maxfield*, the Minnesota Supreme Court found that a ten-year-old child of the divorcing parties was "old enough and mature enough to express a preference where and with whom he wishes to live during his approaching teen-age years." 452 N.W.2d 219, 219, 223 (Minn. 1990) (analyzing the best interests of the child pursuant to Minn. Stat. § 518.17, subd. 1 (1988)). In that case, father lived in Minnesota, while mother lived in Pennsylvania. *Id.* at 219. Here, father testified that M.T. is "very mature," and Dr. McNaught described him as "a very mature 10 1/2 year old child." In light of *Maxfield*, the district court erred by not analyzing and making findings as to M.T.'s preference.

While Dr. McNaught did not reveal M.T.'s preference as to relocation, she found that "[p]rojective testing clearly indicates that [M.T.] sees his overall life being better if he continues to primarily reside with his mother." On the other hand, "in projective testing, [M.T.] does not see his life turning out as well if he were to live with his father." Dr. McNaught also reported that M.T. was experiencing anxiety about choosing between his parents.

*(5) Pattern by relocating parent to promote or thwart the child's relationship with the other parent*

The district court noted father's concern that mother does not promote or support his relationship with M.T. and found that mother "had nothing positive to say about

[father] as a person or [as] a father to [M.T.]" The district court concluded that this raised serious questions about whether mother would promote or encourage father's relationship with M.T. if she were allowed to relocate. The district court also found that there were "serious questions about [mother's] trustworthiness and the parties' ability to maintain contact regarding [M.T.]" The district court found that mother was "intentionally vague" with father about her evolving work plans in California, she disregarded father's parenting time, and she "lied to [father] in July 2013 when [father] inquired where she and [M.T.] were living." And while her relocation motion was pending, mother took M.T. to see Dr. McNaught without informing father. According to the district court,

> All of these actions and the attitude and testimony of [mother] toward [father] are very troubling. There were active steps taken by [mother] to not be forthcoming with [father] about her plans and how they affected [M.T.] and [father]. Should [mother] be allowed to relocate to California with [M.T.], this [c]ourt has serious concerns about how that would further encourage or allow [mother] to exclude [father]. [Mother] has certainly not established a demonstrated ability to promote [M.T.'s] relationship with [father].

Essentially, the district court found that mother's stated intention to promote father's relationship with M.T. was not credible, and we will not disturb the district court's credibility determinations. *D.F.*, 752 N.W.2d at 96.

*(6) Effect on the relocating parent and child's quality of life*

Mother testified that relocation will benefit her and M.T. financially by allowing her to pursue her legal career, and that M.T. will do well in school in California. However, the district court expressed "serious reservations about the veracity and effort

[mother] put into her Minnesota job search." The district court noted that mother turned down the non-attorney position in Mankato and also noted "significant concerns regarding [mother's] job stability in California."

*(7) Parents' reasons for opposing or supporting relocation*

Mother testified that there are more job opportunities in California than in Minnesota and that the move would improve her and M.T.'s quality of life. Father testified that he would have a diminished role in M.T.'s life, and mother would alienate father if she was allowed to relocate with M.T.

*(8) Safety and welfare of the child or the relocating parent*

The district court found that this factor is inapplicable because there is no domestic abuse in this case.

In sum, the district court analyzed each applicable statutory factor and made detailed findings as to each factor. While the district court erred in not considering M.T.'s preference as to relocation, there is reasonable evidentiary support for the district court's findings with regard to the other statutory factors, most of which appear to support the district court's denial of mother's motion to relocate. Most significantly, throughout the order, the district court expressed its concern that mother's proposed relocation would undermine father's relationship with M.T.

When considering a motion to relocate the residence of a minor child, a district court's discretion is broad. *See Goldman*, 748 N.W.2d at 284. The law "leaves scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations." *Vangsness v. Vangsness*, 607 N.W.2d 468, 477 (Minn. App.

15

2000).  Based upon this record, we conclude that the district court did not abuse its discretion in denying mother's relocation request.

## II.

Mother also argues that the district court erred as a matter of law by "proactively" modifying custody, even though neither party moved for a custody modification.  The interpretation of a statute is a question of law, which we review de novo.  *Goldman*, 748 N.W.2d at 282.

"[T]he court shall not modify a prior custody order" unless "a change has occurred in the circumstances of the child or the parties and . . . modification is necessary to serve the best interests of the child."  Minn. Stat. § 518.18(d) (2014).  Relevant to this case, "the court shall retain the custody arrangement . . . that was established by the prior order" unless "the court has denied a request of the primary custodial parent to move the residence of the child to another state, and the primary custodial parent has relocated to another state despite the court's order."  *Id.* (d)(v).

Here, the district court crafted a somewhat creative custody determination, perhaps because it did not believe mother's assurances that she would return to Minnesota if her relocation request was denied: "If [mother] decides to move outside the State of Minnesota, then [father] shall be awarded sole physical custody of [M.T.] . . .  If [mother] returns to Minnesota, the terms of the parties' [s]tipulated [j]udgment and [d]ecree are reinstated."  Mother objects to the first scenario and argues that the district court "proactively" modified custody.  However, this scenario fits squarely under section

16

518.18(d)(v). The district court did not err in awarding father sole physical custody in the event mother decides to stay in California.

**III.**

Mother challenges three aspects of the district court's child-support determination.

**A.**

Mother contends that the district court erred by making her child-support obligation retroactive to a date prior to father's motion to modify child support. "A modification of support . . . may be made retroactive only with respect to any period during which the petitioning party has pending a motion for modification but only from the date of service of notice of the motion on the responding party . . . ." Minn. Stat. § 518A.39, subd. 2(e) (2014). The application of a statute is a question of law, which we review de novo. *Gellert v. Eginton*, 770 N.W.2d 190, 196 (Minn. App. 2009), *review denied* (Minn. Oct. 20, 2009).

The district court made mother's monthly child-support obligation retroactive to August 1, 2013. On August 2, 2013, father moved for an order *suspending his own child-support obligation*. However, father did not move for an order *modifying child support* as a result of a change in primary residence of M.T. until August 30, 2013. The district court erred in ordering mother to pay child support as of August 1, 2013, a date prior to father's motion for modification.

**B.**

Mother next argues that the district court abused its discretion by requiring mother to pay child-care costs as part of her child-support obligation because father did not

17

submit adequate proof of M.T.'s child-care expenses. "Child care support must be based on the actual child care expenses." Minn. Stat. § 518A.39, subd. 7 (2012). The moving party bears the burden of proof in a child-support modification proceeding. *Bormann v. Bormann*, 644 N.W.2d 478, 481 (Minn. App. 2002). "In deciding whether to modify support, the district court enjoys broad discretion and will be reversed only if it abuses that discretion by resolving the question in a manner that is against logic and the facts in the record." *Id.*

At the relocation hearing, father testified that M.T. was currently attending before- and after-school child care at the cost $112.50 per week. Father submitted the child-care program's brochure as evidence of the program's cost, which states that ten sessions costs $112.50. This testimony and evidence is sufficient to establish M.T.'s child-care expenses, and the district court did not abuse its discretion by basing mother's child-care-support obligation on this evidence.

## C.

Finally, mother argues that the district court abused its discretion by basing mother's child-support obligation on the guidelines set forth in Minn. Stat. § 518A.34 (2014), rather than Minn. Stat. § 518.131 (2014), which governs temporary orders. Mother asks this court to use its "equitable authority" and grant her relief because her income is "in flux," and she incurred "extraordinary expenses" by maintaining households in both Minnesota and California. However, in its December 23, 2013 order, the district court did not impose a *temporary* child-support obligation on mother. Rather, the district court imposed a *permanent* child-support obligation and therefore correctly

18

calculated the obligation under section 518A.34. But, even if section 518.131 applied, subdivision 7 of that section specifically provides that "[t]he court shall be guided by the factors set forth in chapter 518A (concerning child support)." Accordingly, the district court did not abuse its discretion in establishing mother's child-support obligation under the guidelines.

In summary, we affirm: (1) the district court's denial of mother's motion to relocate; (2) the district court's custody determination; and (3) the district court's child-support determination in all respects except as to the retroactive date of mother's child-support obligation. We reverse the retroactive date of mother's child-support obligation and remand for the district court to modify the retroactive date to August 30, 2013, rather than August 1, 2013, and for further proceedings consistent with this decision and regarding the enforcement of mother's child-support obligation.

**Affirmed in part, reversed in part, and remanded.**